### SEAL et al. v. BOOKKEEPER PUB. CO., Limited, et al.

#### (Circuit Court of Appeals, Sixth Circuit. May 3, 1904.)

#### No. 1,258.

**1. PATENTS—LICENSE—EVIDENCE HELD NOT TO ESTABLISH RENEWAL.**

An exclusive license to manufacture a patented article, granted by the owner of the patent for the term of one year, with privilege of renewal on certain conditions, *held*, under the evidence, not to have been renewed within the time agreed upon, wherefore the rights of the licensee terminated at the expiration of the year, and a second licensee, who obtained an exclusive license to run from that time, paying the agreed consideration therefor, was vested during its term with the sole and exclusive right to make and sell the patented article.

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

Paul T. Davis (A. Parker Smith, of counsel), for appellants.
Parker & Burton (R. A. Parker, of counsel), for appellees.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. This was a suit for the infringement of a patent, with the usual prayer for an accounting. The patent involved is No. 414,335, for an improved form of adding machine. It was applied for by Lester C. Smith, granted to his assignee, Charles H. Webb, and on January 19, 1894, became, by assignment, the property of Edwin R. Beach, one of the original complainants. In the latter part of July, 1900, Beach granted the complainant below, Nora Seal, an exclusive license to manufacture and sell the patented improvement for a period of three years beginning August 1, 1900. On July 27, 1899, Beach had granted to the Bookkeeper Company, the

130 F.—29

predecessor of the Bookkeeper Publishing Company, Limited, one of the defendants, a license to make and sell the patented improvement for one year from that date, "with the privilege of renewal or purchase of the business." The license to Nora Seal was granted and accepted in the belief that the prior license to the Bookkeeper Company had expired, but the latter, claiming a renewal, continued to make and sell the patented device, and accordingly this suit was instituted on January 8, 1901, by Nora Seal and E. R. Beach, the licensee and licensor, against the Bookkeeper Publishing Company, Limited, its officers and directors. After the filing of the bill, Beach and the Bookkeeper Company got together, and on April 3, 1901, the former assigned the latter all his interest in the patent. Since then the Bookkeeper Company has owned the patent. After this sale a supplemental bill setting it up was filed. A motion for a preliminary injunction was submitted, but never decided. The case was finally heard on July 28, 1902, and a decree dismissing the bill rendered on January 10, 1903. On November 4, 1903, after the appeal to this court had been perfected, the opinion of the court below was filed, in which the dismissal was placed upon the ground that the defendant's license was renewed for one year, and therefore in force when the complainant's license was granted and the original bill filed.

1. The validity of the patent is not in question. The dispute is between two licensees, and the sole matter for determination is whether the license of July 27, 1899, to the Bookkeeper Company, was renewed. This license was never executed in written form. A memorandum of the oral agreement reached was made. This was handed over to Elmer H. Beach, the manager of the Bookkeeper Company, to be put in typewritten form of execution. The following is a copy of the memorandum, the words erased being printed in italics and those inserted in small caps:

"Agreement made 27th day of July, 1899, between E. R. Beach, of Jersey City, N. J., OWNER OF PATENT, and The Bookkeeper Company, OR ITS SUCCESSORS, of Detroit, Mich.

"Witnesseth: That the said E. R. Beach, for and in consideration of the following conditions, hereby grants unto the said Bookkeeper Company the sole right of manufacture and sale of the WEBB ADDER for one year with privilege of renewal or purchase of the business.

"The Bookkeeper Company hereby agrees to use proper ways and means to warrant a satisfactory success of the business, and to manufacture a first lot of one thousand adders of *present* SUITABLE style and finish, each adder to bear a number stamped on some part of outside surface, so as to be easily seen and to keep a correct account by numbers of all made and sold by numbers and on or before the 10th of each month render such statement of all sold up to that date and at the same time to pay E. R. Beach a full royalty of 10 per cent. on selling prices on all sold EXCEPT to E. R. B., and to furnish said E. R. Beach such quantities of Adders as he may order (to supply agents with whom he NOW has a stipulated contract) from the first lot of one thousand, at $1.50, $2.00 each, *and from subsequent lots at only 20 per cent. in addition to cost of manufacture.* * * * *No change from present style shall be made without consent of E. R. Beach,* and that no transfer of this agreement shall be made."

Indorsed on back: "Skeleton of Contract. July 27, '99. Mr. E. H. Beach will typewrite contracts and send to me for signature. Conditions mentioned herein agreed upon at personal interview. E. R. B. I send cards by mail."

The memorandum was never put in typewritten form by Elmer H. Beach, and never executed. In April, 1900, E. R. Beach, being dissatisfied with the conduct of the Bookkeeper Company, and having employed an attorney in Detroit, prepared and presented to the Bookkeeper Company a formal draft of the agreement for execution. The Bookkeeper Company never signed this, but, according to the testimony of Beach's attorney, conceded it correctly stated the agreement, with the exception of certain prices. In this formal contract, the following paragraph regulated the right of renewal:

"2nd. That second party shall have the right to renew this sole and exclusive privilege for a further period of one year, after its expiration, upon the same terms and conditions herein contained, by mailing first party, at least thirty days before Aug. 1st, 1900, written notice of its intention so to do, and first party hereby agrees to make, execute and deliver such other or further license papers or transfers as may be necessary and requisite in the premises to render this renewal legal and effective."

Recurring to the memorandum, it is to be noted that the license was granted upon certain conditions. Whatever efforts the company may have made, or money expended, it did not succeed, during the year it held the license, in complying with any of these conditions. It did not turn out a single perfect machine, or pay the licensor a dollar of royalty. The machines it did turn out were not stamped, and no account was ever rendered. Early in 1900, months before the end of the license period, the licensor became dissatisfied with the situation, and employed Mr. Davis, a lawyer in Detroit, to assist him in asserting and protecting his rights as against the licensee. At the same time he began to look about for another licensee. The Bookkeeper Company was not left in doubt as to his demands or intentions. In his letter of April 7, 1900, after calling attention to its failure to comply with the conditions of the contract, he said:

"All I ask is that you live up to the first contract to the letter. Mr. Davis will see you and report to you what I have written him, and if you are disposed to do the right thing we may arrange to go on as per contract, and if not, then our business relations must be cancelled. Nearly a year has gone without satisfactory results, and I will not consent to further business unless I can have fair sailing."

Later, in the letter of June 7, 1900, he said:

"Next month one year will have passed since you arranged with me for the business for one year with privilege of renewal if satisfactory to me. It may be that you have got things in shape to make a success of the business, but I can not stand another such year of mishaps. Are you coming here soon? There are many things to consider and arrange between us if the business is continued by you, and more can be done in an hour's talk than by correspondence or the use of Mr. Davis as a go-between. * * * *I have an offer for my patent, and also to arrange for the business of manufacturing and selling, but will keep my word sacred to you until the 28th of July 1900.* A full statement of sales, etc., ought to be made to me by you as agreed, and I shall expect one on or before the 10th inst. as agreed. I have not received anything from the business since you have had it, and it seems to me that I should be credited with royalties from your sales."

These letters sufficiently notified the Bookkeeper Company that Beach was not satisfied; that he was looking forward to the termination of the license at the end of the year; that he would not consent to its continuance by acquiescence; there must be a formal re-

newal by proper notice. Unless new and satisfactory arrangements were made, he would stand upon his rights. He suggested an interview. The extent of his promise was that he would hold his word sacred to them until the 28th of July, the day after the termination of the license; no longer. Nothing was done in pursuance of this invitation, and in July Beach further defined his position by notifying the Bookkeeper Company to discontinue the manufacture of the machine. This is shown by the testimony of E. R. Beach, the licensor:

"Q. Did you, about the middle of July, 1900, send a notice to the Bookkeeper Publishing Company, Limited, requiring it to discontinue the manufacture of these adding machines on or before July 28, 1900? A. I did."

And of E. H. Beach, the manager of the Bookkeeper Company:

"Q. Did not the Bookkeeper Publishing Company, Limited, receive a notice from E. R. Beach in the month of July, 1900, ordering it to discontinue the manufacture of adding machines under the agreement made between it and E. R. Beach? A. Yes."

But it is said (and much stress was laid on this by the court below in its opinion) that the break between Beach and the Bookkeeper Company, and the granting of the license to Mrs. Seal, was due to the double dealing of one John L. Herring, a cousin of Mrs. Seal, who, to advance his own interest, succeeded in setting them by the ears. Herring acted as the agent for Beach in the sale of these adders before the license was granted to the Bookkeeper Company. He was one of the agents reserved by Beach, who were to be supplied with machines only through Beach. It seems that in the fall of 1899 Herring visited and corresponded with the Bookkeeper Company and its manager, with the view of securing direct relations with it and obtaining machines without the intervention of Beach. The Bookkeeper Company apparently encouraged this correspondence, and from week to week kept promising Herring to get out a perfect machine. Herring on his part was trying to place all the machines he could, and (as he says) "jolly" his customers along with the promise of new machines next week. Finally, along in February, 1900, Herring became thoroughly discouraged, and apparently gave up hope of getting any merchantable machines from the Bookkeeper Company, and from that time on did what he could to get Beach to terminate the license to the Bookkeeper Company and make arrangements with somebody else, and he persuaded his cousin, Mrs. Seal, who had some means, to invest in the business. It is no doubt true that in the fall of 1899, when Herring was trying to ingratiate himself with the Bookkeeper Company, he belittled Beach, and, later, when he had given up hope of the Bookkeeper Company, he turned again to Beach and denounced it. But the cause for his course each time is apparent, and not a little of what he said was justified by the conditions as they affected him. At any rate, what he contributed to the situation matters little. Stimpson Computing Scale Co. v. Stimpson Co., 104 Fed. 893, 895, 44 C. C. A. 241. The situation existed, and, as a result, Beach, acting under legal advice, took the position we have described, with the results mentioned.

2. Although the Bookkeeper Company was thus advised that Beach was standing upon his rights, and that, if it desired to renew the license, it must give a proper notice in due time, no notice was given. The company pursued its usual course of making promises while ignoring demands. What it now claims as a notice is the following letter:

"Detroit, Mich., July the 26th, 1900.

"Mr. E. R. Beach, Jersey City, N. J.—Dear Sir: Yesterday I had a call from Mr. Davis, and I suggested that he write you to come to Detroit at your convenience and look matters over, and satisfy yourself that I am doing everything I can in the matter, and that the conditions are just as I represented them to you. I am promised perfect machines next week, and I think it would be a good idea for you to be here at that time and see that everything is going along all right.

"It will be very foolish on your part to take any action on this matter in view of the circumstances.

"Sincerely yours, [Signed] E. H. Beach, Editor."

It is to be kept in mind that the license under consideration was not like that in St. Paul Plow Works v. Starling, 140 U. S. 184, 196, 11 Sup. Ct. 803, 35 L. Ed. 404, unlimited in duration, which requires mutual consent, or some positive act by one of the parties, to terminate it. Walker on Patents, § 308. This license was of limited duration; it ran only for a year; and the positive act required was not one to end, but to extend, it. Bearing this in mind, was the above letter notice of an election on the part of the Bookkeeper Company to renew the license for another year? We think not. It would not have bound the Bookkeeper Company for another year, nor did it bind the licensor. It says, in substance, that the company was doing what it could, and was promised "perfect machines next week." Beach had heard this before. Nothing was said as to what the Bookkeeper Company desired or intended to do if it was again disappointed in the machines. Suppose there had been another failure, could Beach have held it, under this letter, as licensee for another year? Certainly not. The company might have answered: "We never told you we desired to renew. You had notified us that new arrangements would have to be made to continue business with you. We simply informed you of what we had done and what had been promised, and expressed our opinion that it would be very foolish on your part to make arrangements with anybody else until we could see how these machines turned out. If they had proved successful, we would have been glad to enter into arrangements with you for a further license. That was the extent of our letter."

3. During March, Beach wrote to his attorney in Detroit, stating that "for nearly eight months" the Bookkeeper Company had his business in hand, and had "broken every provision of the contract." On March 30th he wrote to Herring, saying:

"If you know of a party who will put up the necessary money to run the business, I will consider a proposition."

On June 30th he again wrote Herring, saying:

"My verbal contract with said company, Beach as manager, ends the 28th of next month (July), and unless new terms are made, and a competent guaranty is given, it will not be renewed. The result of Beach's work with it for

eight months is enough to satisfy me that it is best for me to make other arrangements at once."

He then invites Herring to take an interest in the business, and concludes by saying:

"I have another party who wants to get into the business, so answer me promptly by return mail."

In the latter part of July, the license to Mrs. Nora Seal was granted. This was an exclusive license for three years, beginning August 1, 1900. The machines were to be made in blocks of 1,000, for which Mrs. Seal was to pay Beach $300 in advance for the first thousand, $250 in advance for the second thousand, and $200 in advance for each succeeding thousand. Beach was to be supplied with all the adders he might ask for at a price "to be agreed upon." Each party covenanted not to sell any adders to the Bookkeeper Company. The licensee was to prosecute all infringers. Upon a failure to perform any covenant of the license, it was to·be revoked, and the licensee was to forfeit the sum of $500. Upon the execution of this license by Beach, Mrs. Seal paid him the $300 for the first thousand machines, and afterwards expended between $2,000 and $3,000 in providing tools and paying for the first thousand machines. On August 9, 1900, after Beach had granted the license to Mrs. Seal, the Bookkeeper Company wrote him, sending him extracts from Herring's letters belittling him, and expressing surprise that he should have permitted Herring to come between them. Beach held this letter until the latter part of October, when he answered, expressing regrets, and renewing relations with the Bookkeeper Company. In the meantime Mrs. Seal had expended the money referred to in getting out the new machines. It seems, however, that these machines were more expensive than those manufactured by the Bookkeeper Company, and, since Mrs. Seal's license provided they should be furnished to Beach at a price "to be agreed upon," Beach could not get the machines at the price he was willing to pay. As a result, he turned again to the Bookkeeper Company, and since then has acted as its ally in this litigation.

Mrs. Seal is here standing upon her license, executed for a valid consideration by Beach, after, as he believed, the license of the Bookkeeper Company had expired. It is said, however, she had notice that the Bookkeeper Company had had a license which contained a privilege of renewal, and should have inquired of the company as to its claims under this license. But, if she had inquired, she would have ascertained only what we know now, and from this she would have been warranted in concluding, not only that the Bookkeeper Company had failed to give any notice of a desire to renew its license, but that Beach, the licensor, had taken positive steps, by notice, to prevent any claim of a renewal through acquiescence in the conduct of the company in continuing to act under the license after it had expired. ·

We have gone a good deal into detail in this opinion. The question is, after all, one of fact—what the parties intended and did. No suit has been brought to cancel Mrs. Seal's license on the ground

of fraud. There is no issue of that kind. Her license was valid, and, so far as appears, she has faithfully performed its covenants, including that requiring her to sue any infringer. Beach's quarrel is with Herring, and Herring is not in the ·case. Beach must have known Herring had no money to invest in the business. He was and had been a mere agent, interested in getting a licensee who would promptly turn out good machines. If Beach relied upon him to manage Mrs. Seal's business, and thus carry out some private arrangement outside the license, he was doing a foolish thing, for which Mrs. Seal cannot be held liable. She is only responsible for her own agreement, which was set out in the license.

The judgment of the lower court is reversed, and the case remanded for further proceedings not inconsistent with this opinion.